JOHNNY R. BARNES *et al.*, Plaintiffs-Appellants, v. THE CHICAGO HOUSING AUTHORITY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—00—2856

Opinion filed December 3, 2001.—Rehearing denied January 15, 2002.

John E. Marszalek, of Marszalek & Marszalek, Paul R. Karasik, of Karasik & Herndobler, and John F. Klebba, of John F. Klebba, P.C., all of Chicago, for appellants.

David E. Neumeister, of Querrey & Harrow, Ltd., of Chicago, for appellee Chicago Housing Authority.

James Kirk Perrin, of Chicago, for appellee LeClaire Courts Resident Management Corporation.

PRESIDING JUSTICE COHEN delivered the opinion of the court:
Plaintiffs Johnny R. Barnes, Angela Barnes and Angela Foster ap-

peal the dismissal of their third amended complaint against defendant Chicago Housing Authority (CHA), as well as the order of the trial court granting summary judgment in favor of defendant LeClaire Courts Resident Management Corporation (LCRMC), a private, not-for-profit corporation. The issue before the court is one of first impression: whether the LCRMC is a "local public entity" within the meaning of section 1—206 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1—206 (West 2000)) (the Tort Immunity Act). If the LCRMC is determined to be a "local public entity," then the LCRMC is immune from liability for its alleged failure to provide adequate security at the LeClaire Courts public housing development. 745 ILCS 10/4—102 (West 2000). Should we determine that the LCRMC enjoys immunity under the Act, the plaintiffs then urge us to hold that the legislature exceeded the scope of its authority in extending such immunity to the LCRMC and ask that we declare section 1—206 unconstitutional.

We hold that the trial court correctly dismissed plaintiffs' third amended complaint as to the CHA. We further hold that the LCRMC is a "local public entity" within the meaning of section 1—206 and is therefore immune from plaintiffs' allegations of failure to provide adequate police protection at LeClaire Courts. The trial court correctly entered summary judgment in favor of the LCRMC and we affirm.

## BACKGROUND

On June 17, 1994, plaintiff Johnny R. Barnes was visiting his wife and daughter, coplaintiffs Angela Barnes and Angela Foster, at their residence in the LeClaire Courts public housing development on 43rd Street in Chicago. LeClaire Courts was owned by defendant CHA and managed by defendant LCRMC. While on the LeClaire Courts premises, Mr. Barnes observed his daughter, Angela Foster, being attacked and severely beaten by a group of teenage gang members. When Mr. Barnes attempted to intervene, he was shot by one of the gang members, resulting in permanent paralysis below the waist.

For several years prior to the date of the shooting, the LCRMC had contracted to provide private security services for the LeClaire Courts development. On that date, however, no private security officers were present on the LeClaire Courts premises.

In order to contract for outside security services, the LCRMC was required to submit proposed contracts to the CHA (and ultimately to the United States Department of Housing and Urban Development (HUD)) for review and approval. In this case, the contract in effect between the LCRMC and Network Security, a private security company, had expired prior to the date of the shooting. Prior to the expiration of

the Network Security contract, the LCRMC had submitted to the CHA a proposed contract to retain the services of Tight Security, Inc., which was scheduled to begin providing security services on the LeClaire Courts premises on April 1, 1994. However, the CHA had not yet approved funding for the LCRMC's proposed Tight Security contract, resulting in a six- to eight-week gap in private security coverage at the LeClaire Courts complex. It was during this gap that Mr. Barnes and his daughter were injured.

Several police officers offered deposition testimony that at the time of the shooting, the LeClaire Courts development was hotly contested turf in an armed conflict involving no fewer than nine different street gangs. These officers further testified to a dramatic increase in criminal activity at the LeClaire Courts development in 1994 following the expiration of the Network Security contract.

Johnny Barnes and Angela Foster brought an action to recover damages for injuries sustained during the attack at LeClaire Courts. Plaintiffs' third amended complaint contained eight counts, with different plaintiffs seeking relief under each count.[1] In paragraph 24 of counts I and II, plaintiffs alleged that the CHA committed willful and wanton misconduct in that it:

"A. Failed to adequately police the premises of the LeClaire Courts with its own police force;

B. Failed to act on defendant [LCRMC's] request for approval to hire a new private security firm for the LeClaire Courts before June 17, 1994;

C. Mismanaged the LeClaire Courts by failing to oversee defendant [LCRMC];

D. Failed to adequately monitor defendant [LCRMC] after defendant [LCRMC] was placed on probation by defendant CHA;

E. Failed to adequately monitor the crime statistics at the LeClaire Courts and therefore failed to recognize that the LeClaire Courts were in a high crime area in need of additional security and/or police; and

F. Increased the danger at the LeClaire Courts by failing to police the premises after the contract with Network Security had not been renewed and after gang activity and incidences of violence increased markedly, and after defendant CHA knew, or should have known, that gang activity and incidences of violence would increase after the contract with Network Security was terminated."

[1]Because Angela Foster was a minor at the time of the attack, her mother sued on her behalf to recover medical expenses incurred as a result of her injuries. Counts I, III, V and VII were therefore submitted in the name of plaintiff Johnny Barnes, while identical counts II, IV, VI and VIII were submitted in the names of plaintiffs Angela Barnes and Angela Foster.

In counts III and IV, plaintiffs alleged negligence against the CHA on identical grounds.

In paragraph 24 of counts V and VI, plaintiffs alleged that the LCRMC committed willful and wanton misconduct in that it:

"A. Failed to renew the contract of the previous security firm without first making certain that a new security firm was in place;

B. Failed to possess and apply the requisite degree of skill and care in managing the premises, in making an oral promise to hire Tight Security, and then not hiring any private security to take the place of Network Security until after June 17, 1994;

C. Failed to protect the plaintiffs from injury when the defendant [LCRMC] knew or should have known of the increased dangers and crime on the premises after the contract with Network Security was not renewed; and

D. Increased the danger on the premises by failing to police the premises after the contract with Network Security was not renewed and gang activity and incidences of violence increased markedly."

In counts VII and VIII, plaintiffs alleged negligence against the LCRMC on identical grounds.

On July 15, 1999, the trial court granted the CHA's motion to dismiss plaintiffs' third amended complaint pursuant to section 2—619 of the Illinois Code of Civil Procedure. 735 ILCS 5/2—619 (West 2000). The trial court found that the CHA was immune from liability pursuant to sections 2—104, 2—201, 3—108 and 4—102 of the Tort Immunity Act. 745 ILCS 10/2—104, 2—201, 3—108, 4—102 (West 2000). On December 17, 1999, predicated on a finding that the LCRMC was a "local public entity" within the meaning of section 1—206 of the Tort Immunity Act, the trial court: (1) held that the LCRMC was immune from liability under section 4—102 for failure to provide security on the LeClaire Courts premises; and (2) granted the LCRMC's motion for summary judgment. 745 ILCS 10/1—206, 4—102 (West 2000).

Plaintiffs moved for reconsideration of the order granting summary judgment in favor of the LCRMC. Plaintiffs argued that as a private, not-for-profit corporation, the LCRMC was not a "local public entity" within the meaning of section 1—206. Plaintiffs further argued to the trial court that if it construed section 1—206 to cover the LCRMC, then it must find section 1—206 to be unconstitutional in that the General Assembly had exceeded its authority in granting sovereign immunity to a "nonsovereign." The trial court denied plaintiffs' motion to reconsider, specifically finding section 1—206 to be constitutional. This appeal followed.

## ANALYSIS

## 1. CHA

### A. Adequate Police Protection

■ We first consider plaintiffs' argument that the trial court erred in dismissing plaintiffs' third amended complaint as to the CHA. Motions to dismiss pursuant to section 2—619 of the Illinois Code of Civil Procedure (735 ILCS 5/2—619 (West 2000)) are reviewed *de novo. Neppl v. Murphy*, 316 Ill. App. 3d 581, 583 (2000).

The trial court ruled that under the Tort Immunity Act, the CHA was immune from liability for both negligence and willful and wanton misconduct as to each of the allegations set forth in subparagraphs 24A through F of plaintiffs' third amended complaint. Plaintiffs do not dispute that the CHA, as a municipal corporation, is a "local public entity" within the meaning of section 1—206 of the Tort Immunity Act. 745 ILCS 10/1—206 (West 2000); *Davis v. Chicago Housing Authority*, 136 Ill. 2d 296, 299-300 (1990). Rather, plaintiffs argue that the trial court erred in applying various sections of the Tort Immunity Act to the CHA.

■ In subparagraphs 24A, E and F, plaintiffs alleged that the CHA failed to provide adequate police protection on the LeClaire Courts premises.[2] The trial court found the CHA immune from these allegations under section 4—102 of the Tort Immunity Act. Section 4—102 provides:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals. This immunity is not waived by a contract for private security service, but cannot be transferred to any non-public entity or employee." 745 ILCS 10/4—102 (West 2000).

■ Section 4—102 notwithstanding, plaintiffs argue that where the CHA has voluntarily undertaken to provide security at one of its housing developments, the CHA may be held liable on a theory of willful and wanton misconduct for failure to protect an invitee on CHA property from criminal attack by a third party. *Pippin v. Chicago*

---

[2]Plaintiffs concede in their brief that "Defendant CHA is immune from liability for *negligently* failing to provide police protection." (Emphasis in original.) We therefore consider this issue solely in the context of willful and wanton misconduct.

*Housing Authority*, 78 Ill. 2d 204, 209 (1979); *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317 (1980); *Phillips v. Chicago Housing Authority*, 89 Ill. 2d 122, 129 (1982); *Hernandez v. Rapid Bus Co.*, 267 Ill. App. 3d 519, 524 (1994).

Plaintiffs' argument lacks merit. Our decision in *Lawson v. City of Chicago*, 278 Ill. App. 3d 628 (1996), controls. In *Lawson*, we discussed whether the voluntary undertaking doctrine would supercede the City of Chicago's immunity from liability under section 4—102 for its alleged failure to operate metal detectors installed at Tilden High School. *Lawson*, 278 Ill. App. 3d at 634-35. As in the case at bar, the plaintiff in *Lawson* relied on *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313 (1980), in support of its voluntary undertaking theory. The plaintiff in *Lawson* further relied on *Siklas v. Ecker Center for Mental Health, Inc.*, 248 Ill. App. 3d 124 (1993), and *Comastro v. Village of Rosemont*, 122 Ill. App. 3d 405 (1984). In considering these cases, we stated:

> "*Cross* and *Siklas* are not relevant to the case at bar since those cases did not involve the Tort Immunity Act. See *Rascher v. City of Champaign*, 262 Ill. App. 3d 592, 595 *** (1994) ('[*Cross*] did not involve the question of governmental tort immunity and, therefore, lends no support to plaintiff's position' that [the] city's voluntary undertaking overrides [the] Tort Immunity Act). The Tort Immunity Act was inapplicable in *Comastro* as well, not because of the absence of an undertaking by a governmental entity but because the governmental entity was engaged in a nongovernmental function and thus was held to the same standard as a private citizen. .
>
> *** In accordance with section 4—102 of the Tort Immunity Act, the City was immune from liability for any alleged failure to provide adequate police protection or to prevent the commission of the alleged crime. The City's undertaking to operate the metal detectors does not override the Tort Immunity Act nor does it prevent that statutory immunity from attaching to immunize the City from liability for any alleged negligence in the performance of that function. See *Rascher v. City of Champaign* [, 262 Ill. App. 3d at 595]; *Hill v. Chicago Housing Authority*, 233 Ill. App. 3d 923 *** (1992); *Burley v. On Waterfront, Inc.*, 228 Ill. App. 3d 412, 419 *** (1992) (extending the voluntary undertaking theory to municipality would 'effectively abrogate the tort immunity provided by section 4—102 of the Act')." *Lawson*, 278 Ill. App. 3d at 635.

We note that the plaintiff in *Lawson* alleged only negligence against the City of Chicago. *Lawson*, 278 Ill. App. 3d at 631-32. However, we can find no reason to depart from *Lawson* where, as here, plaintiffs attempt to hold the CHA liable on a theory of willful and wanton misconduct. None of the cases upon which plaintiffs rely involve or

even address the Tort Immunity Act. The voluntary undertaking doctrine cannot supercede the CHA's statutory immunity from allegations of either negligence or willful and wanton misconduct. *Lawson*, 278 Ill. App. 3d at 635. Under the plain language of section 4—102, the CHA was clearly immune from liability for failure to provide police protection on the LeClaire Courts premises. 745 ILCS 10/4—102 (West 2000).

Plaintiffs direct us to the decision of our supreme court in *Doe v. Calumet City*, 161 Ill. 2d 374 (1994), for the proposition that "plaintiffs can escape the statutory immunities granted municipalities and their employees either by proving facts that show the existence of a special duty and proving simple negligence *or by proving willful and wanton conduct alone.*" (Emphasis added.) *Doe*, 161 Ill. 2d at 390. Plaintiffs argue that *Doe* supports the existence of a willful and wanton misconduct exception to the immunity granted in section 4—102. We disagree.

*Doe* discussed the immunity of police officers from liability for injuries caused while executing their official duties. *Doe*, 161 Ill. 2d at 388-91. Section 2—202 of the Tort Immunity Act states that "[a] *public employee* is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." (Emphasis added.) 745 ILCS 10/2—202 (West 2000). By its plain language, section 2—202 applies only to "public employee[s]," which are defined in the Tort Immunity Act as "employee[s] of a *local public entity.*" (Emphasis added.) 745 ILCS 10/1—207, 2—202 (West 2000). The CHA is clearly a local public entity, not a public employee. Compare 745 ILCS 10/1—206 (West 2000) (defining "local public entity") with 745 ILCS 10/1—207 (West 2000) (defining "public employee"). Thus, the "willful and wanton" immunity exception set forth in section 2—202 does not apply to the CHA. *Doe* is therefore inapposite. See also *Fatigato v. Village of Olympia Fields*, 281 Ill. App. 3d 347, 355-57 (1996) (discussing *Doe* and the reasoning of our supreme court therein).

*In re Chicago Flood Litigation*, 176 Ill. 2d 179 (1997), further undercuts plaintiffs' argument. In *Chicago Flood*, our supreme court considered whether an exception for willful and wanton misconduct could be read into the grant of immunity under section 2—201 of the Tort Immunity Act (745 ILCS 10/2—201 (West 2000)), where section 2—201 did not specifically provide for such an exception. The court held:

> "The plain language of section 2—201 is unambiguous. That provision does not contain an immunity exception for willful and wanton misconduct. Where the legislature has chosen to limit an

immunity to cover only negligence, it has unambiguously done so. Since the legislature omitted such a limitation from the plain language of section 2—201, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct." *Chicago Flood*, 176 Ill. 2d at 196.

"The primary rule of interpreting statutes, to which all other rules are subordinate, is that a court should ascertain and give effect to the intent of the legislature. The court should seek the legislative intent primarily in the language of the statute." *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 387 (1998). Section 4—102 contains no language creating an exception for willful and wanton misconduct. 745 ILCS 10/4—102 (West 2000). In the absence of such language, no willful and wanton misconduct exception to the immunity granted in section 4—102 exists. *Chicago Flood*, 176 Ill. 2d at 196.

We conclude that the trial court correctly dismissed plaintiffs' third amended complaint against the CHA with respect to the CHA's alleged failure to provide police protection at the LeClaire Courts development.

### B. Discretionary Acts

In subparagraph 24B of plaintiffs' third amended complaint, plaintiffs alleged that the CHA was liable on theories of both negligence and willful and wanton misconduct for "[f]ail[ing] to act on defendant [LCRMC's] request for approval to hire a new private security firm for the LeClaire Courts before June 17, 1994." The trial court ruled that the CHA was immune from liability under sections 2—104 and 2—201 of the Tort Immunity Act. 745 ILCS 10/2—104, 2—201 (West 2000).

■ Section 2—104 states:

"A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is *authorized by enactment* to determine whether or not such authorization should be issued, denied, suspended or revoked." (Emphasis added.) 745 ILCS 10/2—104 (West 2000).

We first note that section 2—104 contains no explicit exception for willful and wanton misconduct. As we previously concluded with respect to section 4—102, section 2—104 immunity therefore extends to willful and wanton misconduct as well as negligence. *Chicago Flood*, 176 Ill. 2d at 196.

■ Plaintiffs dispute the applicability of section 2—104 immunity to the CHA, asserting that no "enactment" exists authorizing the CHA to approve or disapprove of the LCRMC's request for funding. We disagree.

The term "enactment" is defined in the Tort Immunity Act as a "constitutional provision, statute, ordinance or regulation." 745 ILCS 10/1—203 (West 2000). The LCRMC was created as part of a HUD program to encourage tenant management of public housing developments. The Code of Federal Regulations provides that "[t]he policies and procedures contained in this part apply to any HA [Housing Authority] that has a Public Housing Annual Contributions Contract with HUD." 24 C.F.R. § 964.3(a) (1999). The parties do not dispute the existence of such a contract between HUD and the CHA.

Subpart B of Part 964, entitled "Tenant Participation," describes in detail the requirements for the formation of a "Resident Management Corporation" (RMC) and sets forth the regulations governing the relationship between a housing authority and a resident management corporation. 24 C.F.R. §§ 964.100 through 964.150 (1999). The authority for the promulgation of the federal regulations relating to resident management of public housing lies in the United States Housing Act of 1937, as amended. 42 U.S.C. § 1437 *et seq.* (West 1994) (the Housing Act). Specifically, section 1437r of the Housing Act provides:

> "A resident management corporation that qualifies under this section *** *shall* enter into a contract with the public housing agency establishing the respective management rights and responsibilities of the corporation and the public housing agency. Such contract shall be consistent with the requirements of this chapter applicable to public housing projects and may include specific terms governing *** submission of and adherence to budgets ***." (Emphasis added). 42 U.S.C. § 1437r(b)(4) (1994).

Thus, before a resident management corporation may undertake to provide management services, it is required by federal law to enter into a contract with its supervising housing authority. *Alazan-Apache Resident Ass'n v. San Antonio Housing Authority*, 885 F. Supp. 949, 955 (W.D. Tex. 1995). Section 1437r further states that "[a]ny management contract between a public housing agency and a resident management corporation that is entered into after November 7, 1988, shall be subject to this section and the regulations issued to carry out this section." 42 U.S.C. § 1437r(h) (1994).

The record reflects that the management contract between the CHA and the LCRMC (the management contract) was entered into as of December 17, 1992. Section 1437r and its attendant regulations are therefore applicable. Paragraph 17.0(d) of the management contract provides that "[c]opies of all contracts involving expenditures of $10,000 or more *shall be forwarded to the [CHA] for review and approval prior to their execution.*" (Emphasis added.) The parties do not dispute that the proposed security contract at issue in this case involved an expenditure in excess of $10,000.

The management contract, mandated by federal law, clearly authorized the CHA to review and approve the LCRMC's request for funding for the proposed security contract. We therefore hold that section 1437r of the Housing Act, which required the LCRMC to enter into the management contract with the CHA, is an "enactment" within the meaning of section 2—104 of the Tort Immunity Act. 42 U.S.C. § 1437r(b)(4) (1994); 745 ILCS 10/2—104 (West 2000). The CHA is therefore immune under section 2—104 from liability for failure to fund the proposed security contract.

■ Plaintiffs dispute the trial court's ruling that the CHA was also immune from liability for failure to fund the proposed security contract under section 2—201 of the Tort Immunity Act. 745 ILCS 10/2—201 (West 2000). Because section 2—201 does not apply to the CHA, we need not address the substance of plaintiffs' argument. Section 2—201 provides:

> "Except as otherwise provided by Statute, a *public employee* serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." (Emphasis added.) 745 ILCS 10/2—201 (West 2000).

As we have stated, the CHA is a local public entity, not a public employee. Compare 745 ILCS 10/1—206 (West 2000) (defining "local public entity") with 745 ILCS 10/1—207 (West 2000) (defining "public employee"). Thus, section 2—201 immunity cannot apply to the CHA, and the trial court erred in so holding. However, because we have found the CHA immune from liability under section 2—104 for failure to fund the security contract, the error is harmless, and reversal is not required.

### C. Failure to Supervise

■ Subparagraphs 24C and D of plaintiffs' third amended complaint allege that the CHA was liable on theories of both negligence and willful and wanton misconduct for failing to adequately oversee and supervise the operation of the LCRMC. The trial court found the CHA immune with respect to these allegations under section 3—108(a) of the Tort Immunity Act. 745 ILCS 10/3—108(a) (West 1994).

We first note that the trial court found the CHA immune under the *preamended* version of section 3—108(a), which contained no exception for willful and wanton misconduct, and which provided in relevant part that "neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3—108(a) (West 1994). After plaintiffs were injured, but before plaintiffs filed this appeal, the

legislature passed Public Act 90—805, which amended section 3—108 of the Tort Immunity Act by creating an exception for willful and wanton misconduct. Pub. Act 90—805, § 5, eff. December 2, 1998 (amending 745 ILCS 10/3—108 (West 1994)).

The trial court held that because the preamended version of section 3—108(a) contained no exception for willful and wanton misconduct, the CHA had a "vested ground of defense" against such allegations. *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 404 (1998). We agree.

> "It is settled that where the legislature changes the law pending an appeal, 'a reviewing court should simply apply the law as it exists at the time of the appeal, *unless doing so would interfere with a vested right.*' (Emphasis added.) [Citation.] ***
> ***
> When this cause of action arose, the [CHA's] immunity under the unamended section 3—108 was 'unconditional,' and ' "immediate, fixed and determinate" ' [citation]; it did not depend on the entry of a judgment. Thus, the [CHA's] right to the total immunity provided by the unamended section 3—108 vested when the cause of action accrued. [Citations.] The amended section 3—108 cannot reach back and take that vested right away, impose a new duty on the [CHA], and breathe life into this previously barred claim." *Henrich*, 186 Ill. 2d at 404-05.

The trial court was therefore correct in applying the preamended version of section 3—108(a).

■ Plaintiffs offer one additional argument disputing the applicability of section 3—108(a) immunity to the CHA. Citing *Capps v. Belleville School District No. 201*, 313 Ill. App. 3d 710, 716 (2000), plaintiffs argue that section 3—108(a) immunity is applicable only in cases involving supervision of recreational and scholastic activities on public property. Plaintiffs conclude that because no such activity was involved in this case, the trial court erred in applying section 3—108(a) to the CHA.

We again disagree. Our supreme court has adopted a much less restrictive reading of section 3—108(a), specifically rejecting plaintiffs' argument in *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370 (1997). The *Epstein* court held that the board was immune from liability from failure to supervise construction work at a Chicago public school:

> "[Section 3—108] clearly applies to the failure to supervise any 'activity' on public property, as it does not limit, in any manner, the types of activities which are included. The plaintiff asks us to read exceptions into this provision for both Structural Work Act claims and construction activities. The plaintiff also asks us to limit sec-

tion 3—108(a)'s provisions to only recreational and scholastic activities. This court has in the past, however, specifically admonished against reading exceptions into or engrafting tacit limitations onto the Tort Immunity Act's language that conflict with the express legislative intent. [Citation.] To accept the plaintiff's argument would require us to do just that. We therefore conclude that section 3—108(a) allows for no such exceptions or limitations." *Epstein*, 178 Ill. 2d at 376-77.

See also *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 192-93 (1997) (finding that the City of Chicago enjoyed section 3—108(a) immunity from liability for its alleged failure to supervise a contractor hired to replace wooden pilings at several bridges over the Chicago River).

We refuse to read into the Tort Immunity Act a limitation that the legislature has not supplied. Under the plain language of the pre-amended version of section 3—108(a), the CHA was immune from allegations of both negligence and willful and wanton misconduct for its alleged failure to supervise the operation of the LCRMC. 745 ILCS 10/3—108(a) (West 1994).

None of the counts that comprise plaintiffs' third amended complaint, whether sounding in negligence or willful and wanton misconduct, survive our analysis. No set of facts can be proved entitling plaintiffs to recover against the CHA in the face of its various statutory immunities. We conclude that the trial court correctly dismissed plaintiffs' third amended complaint as to the CHA. *Niehaus v. Rural Peoria County Council on Aging, Inc.*, 314 Ill. App. 3d 665, 667 (2000).

## 2. LCRMC

### A. Summary Judgment

■ "Summary judgment should be granted if 'there is no genuine issue of material fact and \*\*\* the moving party is entitled to a judgment as a matter of law.' [Citations.] Summary judgment can aid in the expeditious disposition of a lawsuit, but it is a drastic measure and should be allowed only 'when the right of the moving party is clear and free from doubt.' [Citation.] If the plaintiff fails to establish any element of his claim, summary judgment is appropriate. [Citation.] Our standard of review is *de novo*. [Citation.]" *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001).

In granting the LCRMC's motion for summary judgment, the trial court found that the LCRMC was a "local public entity" within the meaning of section 1—206 of the Tort Immunity Act. 745 ILCS 10/1—206 (West 2000). The trial court held that because the LCRMC was a "local public entity" under section 1—206, it was therefore entitled

under section 4—102 to immunity from liability for both negligence and willful and wanton misconduct with respect to its alleged failure to provide adequate police protection on the LeClaire Courts premises.

■ In 1986, the Illinois legislature amended the definition of "local public entity" in section 1—206 to include "any not-for-profit corporation organized for the purpose of conducting public business." Pub. Act 84—1431, art. I, § 2, eff. November 25, 1986. Plaintiffs do not dispute that the LCRMC is a valid not-for-profit corporation under Illinois law. 805 ILCS 105/101.01 *et seq.* (West 2000). Rather, plaintiffs question whether the LCRMC conducts public business within the meaning of section 1—206. During the last decade, several courts have considered what constitutes public business with varying results. Compare *McQueen v. Shelby County*, 730 F. Supp. 1449, 1454 (C.D. Ill. 1990) (finding that county mental health center was conducting public business), *Corral v. Chicago Park District*, 277 Ill. App. 3d 357, 364 (1995) (same as to Chicago's Lincoln Park Zoo), and *Smith v. Northeast Illinois Regional Commuter R.R. Corp.*, 210 Ill. App. 3d 223, 228 (1991) (same as to commuter rail corporation), with *Carroll v. Paddock*, 317 Ill. App. 3d 985, 993-94 (2000)[3] (finding that health care services provider was not conducting public business), *Niehaus v. Rural Peoria County Council on Aging, Inc.*, 314 Ill. App. 3d 665, 670 (2000) (same as to local elder services organization), *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798, 811 (1998) (same as to YWCA), *O'Melia v. Lake Forest Symphony Ass'n*, 303 Ill. App. 3d 825, 830 (1999), *appeal denied* 185 Ill. 2d 632 (2000) (same as to local symphony orchestra association), and *Hills v. Bridgeview Little League Ass'n*, 306 Ill. App. 3d 13, 24 (1999), *rev'd on other grounds*, 195 Ill. 2d 210 (2000) (same as to little league baseball association).

In *O'Melia*, the court explained:

"Our primary goal in interpreting [section 1—206] is to ascertain and give effect to the legislature's intent. To discern that intent, we first consider the plain language of the provision itself and consider it in the context of the act as a whole and in connection with every other section of the act. [Citation.] If the provision is clear and unambiguous, then the plain language of the act must be given effect without resort to other interpretive aids. [Citation.] We must not depart from the plain language of the act by creating exceptions, limitations or conditions that conflict with the express legislative intent. [Citation.]" *O'Melia*, 303 Ill. App. 3d at 828.

The *O'Melia* court went on to state:

[3]In the interest of brevity, we direct the reader to *Carroll v. Paddock* for a more comprehensive review of cases in this area. *Carroll*, 317 Ill. App. 3d at 991-93.

"Neither our own research nor the parties suggest that 'public business' is a term of art or should possess any meaning but its plain, ordinary, and commonly understood meaning. 'Public' is defined as '[p]ertaining to a state, nation, or whole community; proceeding from, relating to, or affecting the whole body of people or an entire community. Open to all ***. Belonging to the people at large; *** not limited to or restricted to any particular class of the community.' Black's Law Dictionary 1227 (6th ed. 1990). 'Business' is defined as an '[a]ctivity or enterprise for gain, benefit, advantage, or livelihood.' Black's Law Dictionary 198 (6th ed. 1990). Thus, to conduct 'public business' under the Act, a corporation must pursue an activity that benefits the entire community without limitation. In addition, the phrase 'public business' is also today commonly understood to mean the business of the government." *O'Melia*, 303 Ill. App. 3d at 828.

In applying these definitions to the activities of defendant Lake Forest Symphony Association (the Symphony Association), the *O'Melia* court first noted that "providing music lessons, subscription concerts, and special events on a pay-for-admission basis does not sufficiently benefit the entire community." *O'Melia*, 303 Ill. App. 3d at 829. The court determined that the "Symphony Association's activities [were] provided only to subscribers or other paying customers, in effect, members." *O'Melia*, 303 Ill. App. 3d at 829. The court next noted that "despite some educational benefit to its membership and other customers, the Symphony Association [did] not provide the government-like services suggested by the phrase 'public business.' " *O'Melia*, 303 Ill. App. 3d at 829. The court found that government-like services necessarily related to traditional areas of government involvement, *i.e.*, services designed to provide for basic "public health, safety, welfare, and education" needs. *O'Melia*, 303 Ill. App. 3d at 829; see generally U.S. Const., Preamble; Ill. Const. 1970, Preamble. The court held that because the Symphony Association was "a membership organization and operate[d] in an area outside of the traditional areas of governmental concern," it was not a "local public entity" for purposes of section 1—206. *O'Melia*, 303 Ill. App. 3d at 830.

We agree that the term "public business" must be given its commonly understood meaning. *O'Melia*, 303 Ill. App. 3d at 828. However, we note that the legislature expressly intended the Tort Immunity Act "to protect local public entities and public employees from liability *arising from the operation of government.*" (Emphasis added.) 745 ILCS 10/1—101.1 (West 2000). Therefore, in light of our supreme court's directive to consider the plain language of section 1—206 in the context of the Tort Immunity Act as a whole and in connection with every other section of the Tort Immunity Act (*Barnett v. Zion*

*Park District*, 171 Ill. 2d 378, 388-89 (1996)), we hold that the paramount inquiry with respect to "public business" must be whether the not-for-profit corporation is involved in the operation of government.

We agree with the court's approach in *O'Melia* based on the operant facts in that case. Whether the activities of the Symphony Association in *O'Melia* sufficiently benefitted the entire community was certainly a relevant area of inquiry in a case involving a paid-membership organization (*O'Melia*, 303 Ill. App. 3d at 829), and may even be dispositive in such cases. See *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798, 811 (1998) (refusing to extend section 1—206 to cover members-only YWCA). However, the community-wide scope of benefit implicit in the dictionary definition of "public" (Black's Law Dictionary 1227 (6th ed. 1990)) notwithstanding, we must bear in mind that the Tort Immunity Act's designated purpose is to shield against liability arising from the *operation of government*. 745 ILCS 10/1—101.1 (West 2000). We therefore reason that the degree to which the corporation's activities benefit the entire community is only relevant where, as in *O'Melia*, the not-for-profit corporation is engaged in activities that in no way implicate traditional areas of government involvement, *i.e.*, public health, safety, welfare, and education. See *O'Melia*, 303 Ill. App. 3d at 830 (distinguishing between areas of traditional government involvement and those, such as music, that are of the public interest). In the instant case, we must therefore scrutinize the activities of the LCRMC in order to determine whether those activities implicate public health, safety, welfare, or education. If so, then under our analysis the degree to which those activities benefit the community at large is irrelevant.

■ Pursuant to case law, we find the following factors to be relevant in determining whether a not-for-profit corporation conducts "public business" within the meaning of section 1—206:

1. whether the corporation "participates in the business of government" by providing the type of services that governments have been traditionally obliged to provide in the areas of public health, safety, welfare and education (*Carroll*, 317 Ill. App. 3d at 994; *O'Melia*, 303 Ill. App. 3d at 830);

2. whether and to what degree the corporation is government funded (*Niehaus*, 314 Ill. App. 3d at 670; *Hills*, 306 Ill. App. 3d at 23-24); and

3. whether and to what degree the corporation is "government run [or regulated] or part of a government unit" (*Niehaus*, 314 Ill. App. 3d at 669; *Corral*, 277 Ill. App. 3d at 364).

■ We now consider the applicability of the above factors with re-

spect to the LCRMC. We begin by examining the LCRMC's statement of corporate purpose as set forth in its articles of incorporation:

"The purposes for which the corporation is organized are: Exclusively charitable or educational purposes which include: (1) to develop a resident management program for LeClaire Courts and LeClaire Extension (collectively 'LeClaire Courts'); (2) to promote economic development in the community and to develop increased employment opportunities for LeClaire Courts residents; (3) to initiate and promote related activities and programs in the community which will increase the well being and improve the quality of life of LeClaire Courts residents; and (4) to acquire property for the corporate purposes *** and to solicit donations and to raise and accept money *** in aid of such purposes."

While the statement of corporate purpose recites that the LCRMC was organized for "[e]xclusively charitable or educational purposes," the record undeniably reflects its primary purpose to be the development of a resident management program for LeClaire Courts. The activities in which it engages relative to this purpose are neither charitable nor educational, but *governmental*.

The LCRMC functions under the supervision of and in cooperation with the CHA, a municipal housing authority. Our legislature has expressly stated that the function of housing authorities in remedying the "shortage of safe and sanitary dwelling accommodations for persons of low income *** constitutes a *public* use and purpose and an essential *governmental* function." (Emphasis added.) 310 ILCS 15/2 (West 2000); *Davis v. Chicago Housing Authority*, 136 Ill. 2d 296, 301 (1990). There can be no doubt that a housing authority's services in managing low-income housing implicate the public welfare, an area of traditional governmental concern. Section 1437r of the Housing Act states that the contract between a housing authority and a resident management corporation "shall be treated as a contracting out of services." 42 U.S.C. § 1437r(b)(4) (1994). Thus, a resident management corporation steps into the shoes of the housing authority under which it operates for purposes of the management services the corporation provides. We conclude that the LCRMC clearly "participates in the business of government" by providing "government-like" services relating to the public welfare. *Carroll*, 317 Ill. App. 3d at 994; *O'Melia*, 303 Ill. App. 3d at 830.

As to our remaining points of inquiry, the record reflects that the LCRMC is entirely government funded. The record further reflects that the LCRMC is subject to regulation by both the CHA and the federal government, as set forth in the Code of Federal Regulations. 42 U.S.C. § 1437 *et seq.* (1994); 24 C.F.R. §§ 964.100 through 964.150 (1999).

It is thus possible for a not-for-profit corporation such as the LCRMC to be involved in the "business of government" yet provide services to a relatively restricted portion of the community. Under such circumstances, the fact that those services are provided primarily to residents of the LeClaire Courts development and not to the community at large has no bearing on our analysis. But see *O'Melia*, 303 Ill. App. 3d at 829, and *Johnson*, 301 Ill. App. 3d at 811 (finding relevant the corporation's area of service with respect to membership organizations).

We conclude that the LCRMC does conduct "public business" within the meaning of section 1—206 of the Tort Immunity Act. 745 ILCS 10/1—206 (West 2000). The LCRMC is therefore a "local public entity" and is entitled, under the plain language of section 4—102, to immunity from plaintiffs' allegations of failure to provide adequate police protection on the LeClaire Courts premises. 745 ILCS 10/4—102 (West 2000). The order of the trial court granting summary judgment in favor of the LCRMC is affirmed.

## B. Constitutional Arguments

■ We review *de novo* a determination of the trial court as to the constitutionality of a statute. *Miller v. Rosenberg*, 196 Ill. 2d 50, 55 (2001).

■ Plaintiffs moved for reconsideration of the order of the trial court granting summary judgment in favor of the LCRMC. The trial court, finding that plaintiffs had timely raised their constitutional challenges, denied the motion for reconsideration and specifically rejected plaintiffs' arguments that section 1—206 violates: (1) the equal protection and due process clauses of both the United States and Illinois Constitutions; and (2) the prohibition against special legislation found in the Illinois Constitution. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2, art. IV, § 13. The trial court also rejected plaintiffs' argument that the legislature exceeded its authority under article XIII, section 4, of the Illinois Constitution by extending tort immunity to the LCRMC. Ill. Const. 1970, art. XIII, § 4.

Plaintiffs attempt to renew these arguments on appeal. First, although plaintiffs allege in their brief that section 1—206 violates both the due process and equal protection clauses of the United States and Illinois Constitutions, they fail to enlighten us in a comprehensible manner on how the alleged violations violate anything—especially the constitutions. We decline to speculate. "The party who challenges a statute's constitutionality bears the heavy burden of clearly establishing the violation alleged." *Rose v. Pucinski*, 321 Ill. App. 3d 92, 96 (2001). The plaintiffs have failed to meet this burden. Their due process and equal protection arguments fail.

Equally artlessly, plaintiffs argue that section 1—206 violates the prohibition against special legislation found in article IV, section 13, of the Illinois Constitution. Ill. Const. 1970, art. IV, § 13. Plaintiffs correctly quote this section as providing that "[t]he General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. However, plaintiffs fail to allege the *existence* of a general law that "is or can be made applicable." Ill. Const. 1970, art. IV, § 13. We decline to search the entire body of Illinois law on plaintiffs' behalf. Plaintiffs' special legislation argument also fails.

Finally, plaintiffs allege that the Illinois legislature exceeded its authority by "extending sovereign immunity to a non-sovereign" when it included within the definition of "local public entity" in section 1—206 "any not-for-profit corporation organized for the purpose of conducting public business." 745 ILCS 10/1—206 (West 2000). Plaintiffs argue that although the "General Assembly may have the power to grant sovereign immunity to 'sovereigns' such as cities, towns, villages, and counties, the General Assembly does not have the power to grant sovereign immunity to private corporations such as Defendant LeClaire."

The 1970 Illinois Constitution abolishes the doctrine of sovereign immunity "[e]xcept as the legislature may provide by law." (Emphasis added.) Ill. Const. 1970, art. XIII, § 4; *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 489 (2001). By its plain language, the grant of legislative authority in article XIII, section 4, does not restrict the types of entities upon which the legislature may elect to bestow such immunity. In the absence of such an explicit constitutional restriction, we decline to hold that the legislature exceeded the limits of its authority under article XIII, section 4, of the Illinois Constitution by extending tort immunity to "not-for-profit corporation[s] organized for the purpose of conducting public business." Ill. Const. 1970, art. XIII, § 4; Pub. Act 84—1431, art. I, § 2, eff. November 25, 1986.

Plaintiffs' final constitutional challenge to section 1—206 also fails. The judgment of the trial court denying plaintiffs' motion for reconsideration and rejecting plaintiffs' challenges to the constitutionality of section 1—206 of the Tort Immunity Act is affirmed.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court: (1) dismissing plaintiffs' third amended complaint as to the CHA; (2) granting summary judgment in favor of the LCRMC; (3)

denying plaintiffs' motion for reconsideration; and (4) finding section 1—206 of the Tort Immunity Act constitutional.

Affirmed.

TULLY and COUSINS, JJ., concur.