MATTHEW JOHNSON *et al.*, Plaintiffs-Appellants, v. DECATUR PARK DISTRICT *et al.*, Defendants-Appellees.

Fourth District No. 5—97—0978

Argued July 16, 1998.—Opinion filed November 25, 1998.—Rehearing denied January 21, 1999.

Robert H. Pedroli (argued), Bruce Major, and Michael J. Colona, all of Robert H. Pedroli & Associates, of Clayton, Missouri, for appellants.

Jay S. Judge, Edward F. Dutton (argued), and Kathryn James Anderlik, all of Judge, James & Dutton, Ltd., of Park Ridge, for appellee Decatur Park District.

Garry E. Davis and Michael A. Walsh (argued), both of Erickson, Davis, Murphy, Johnson, Griffith & Walsh, of Decatur, for appellee Young Women's Christian Association of Decatur, Inc.

Stephen L. Corn and John M. O'Driscoll, both of Craig & Craig, of Mattoon, for appellee Ken Park.

PRESIDING JUSTICE GARMAN delivered the opinion of the court:

Plaintiffs Matthew Johnson (Matt) and his parents, Robert Johnson and Cheryl Johnson, sued defendants Decatur Park District (Park District), Young Women's Christian Association of Decatur (YWCA), and Ken Park (Park), coach of the Decatur Power Tumblers (Power Tumblers), for injuries then 17-year-old Matt sustained when, in attempting a front flip, he jumped off a mini trampoline, fell on his head and shoulders, and broke his neck. The circuit court of Macon County granted summary judgment to all defendants. We now affirm as to the Park District and Ken Park and reverse and remand as to the YWCA.

## FACTS

Matt's injury occurred on the evening of January 20, 1993. As to the Park District, plaintiffs alleged in their complaint that (1) the Park District owned the mini trampoline and the Power Tumblers group was using the facilities of the YWCA, including mats owned by the YWCA; (2) the Power Tumblers group was under the direct control and supervision of Park, who was the program's coach and the Park District's agent and employee; (3) the Power Tumblers was a hazardous and dangerous recreational activity that created a substantial risk

of injury; (4) Matt was not aware of the hazards and dangers associated with the use of mats and mini trampolines without a harness, safety belt, proper setup, and/or spotters; and (5) the Park District was aware of those dangers through Park and through past similar injuries and acted wilfully and wantonly in failing to (a) provide a safety harness or belt, (b) warn of the dangers associated with using the mini trampoline and mats, (c) provide adequate spotters, (d) warn and instruct participants concerning the dangers associated with using a mini trampoline and mats, and of the known serious risk of severe spinal cord injury, (e) properly position the mats to prevent gaps, and (f) provide a safe coach.

Plaintiffs also alleged negligence and wilful and wanton conduct on the part of Park and stated that (1) Matt was a participant and invitee of the Power Tumblers; (2) Park was an employee of the YWCA and the Park District; (3) Matt was not aware of the risks of spinal cord injury associated with the use of mini trampolines and Park, as coach, knew, or should have known, of these dangers and was negligent in allowing Matt to use the equipment without (a) providing a safety harness or safety belt, (b) properly warning of the dangers, (c) providing adequate spotters, and (d) properly positioning the mats and mini trampoline to prevent gaps.

Plaintiffs also alleged negligence against the YWCA. One count alleged an agency relationship between Park and the YWCA and relied on the doctrine of *respondeat superior*. Another count purported to state a cause of action against the YWCA on the basis of its direct negligence. However, examination of this count reveals that it largely repeats the allegations of vicarious liability stated elsewhere in the complaint.

In August and September 1997, all defendants filed motions for summary judgment. In its motion, the Park District alleged that (1) the danger of falling from a height is open and obvious and therefore no duty arose to warn Matt of this danger; (2) it is entitled to immunity under sections 2—109, 2—201 and 3—108 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/2—109, 2—201, 2—108 (West 1992)) because all the conduct of which plaintiffs complain is supervisory or discretionary in nature; and (3) it is entitled to immunity under section 2—105 of the Act (745 ILCS 10/2—105 (West 1992)) because it had no duty to inspect property it did not own.

In its motion for summary judgment, the YWCA alleged that it had no duty to warn of an open and obvious danger. In a supplemental motion for summary judgment, it alleged that it is a local public entity under section 1—206 of the Act (745 ILCS 10/1—206 (West 1992)) and, as such, is immune from liability for alleged negligence.

Park's motion for summary judgment adopted the grounds of immunity alleged by the Park District in its motion. He alleged that (1) he owed no duty to warn against the obvious dangers of falling from a height; (2) as a public employee, he is immune from liability for his exercise of discretion in determining the activities to be performed or the equipment to be used by the Power Tumblers; and (3) he is not liable for a failure to inspect any property other than that owned by the Park District.

The motions relied on various discovery depositions. In his deposition, Matt testified that at the time of the accident he was a senior in high school and was a member of the YWCA. In 1992, prior to participating in any tumbling or gymnastics programs at the YWCA, he read and signed a document entitled "WAIVER AND RELEASE OF ALL CLAIMS." His mother also signed it. In August or October 1992, Matt and a friend got together with Park to discuss starting a Mt. Zion tumbling group. Before he started classes at the YWCA, he had not used a mini trampoline. At the time of the accident, he was able to perform successfully a cartwheel, back handspring, round-off back flip, front flip, and back flip. In doing a front flip, one would run toward the mini trampoline, spring off of it, go into the air, tuck and rotate forward, and land on the feet. Prior to the day of the accident, Matt had successfully done the front flip off the mini trampoline 15 to 20 times. He had unsuccessfully attempted the maneuver "a couple hundred" times and landed on his head, neck, or shoulders, without injury.

On the day of his injury, Matt was practicing with the Power Tumblers. He felt he needed no further instruction on doing the front flip. He knew he could do it successfully. He received instructions from Park prior to the day of his injury on how to do the front flip. He had never seen a safety belt or harness used with the mini trampoline, although he had seen it in floor maneuvers. Prior to the injury, Park did not give him any safety warnings concerning the front flip. He did not understand that there was a risk of breaking his neck. Park had previously told Matt and his friends that they could come to any of the practices held by the Power Tumblers. He did not have a specific invitation from Park to attend this particular practice.

Matt overrotated on the jump that resulted in his injury. When he landed, his head was between the two crash mats. He did not see any spaces between the mats prior to his fall. He did not ask Park or anyone else to spot for him. Park did not say spotters had to be there. Matt was not afraid of any injury because he thought he was being properly trained, since his tumbling classes were held at the YWCA.

When he was a child, Matt learned he should not land on his head

when jumping from a height and he was warned that he should not dive into a shallow pool because he might hurt his neck.

Andrew Garrett, a friend of Matt's and a witness to the accident, testified in his deposition that Park did not discuss any safety considerations prior to using the mini trampoline. Garrett never saw any spotters at the mini trampoline. Park said he and Matt could be on the Power Tumblers team and they started going to practice sessions. Matt had to work and missed the first four weeks of practice. The day of the accident was his first day back. Garrett stated that there were thinner mats beneath the crash mats and they were "velcroed" together, but sometimes they came apart.

When Matt made his jump on the day of his injury, Park was talking to a parent. When Garrett saw him, Matt's head was on the seam between the two crash mats. The mats were seven to eight inches thick. When Garrett knelt down to help Matt, his knee was in the seam, touching the mats underneath.

Park testified in his deposition that he had some formal education in gymnastics or tumbling at a teacher's college many years ago and has been involved as a participant or a coach since the 1930s. He started working with the Power Tumblers in 1987. When he took over the program, they were already using the mini trampoline and he assumed they did not need instruction from him in how to use it. A safety belt could not be used with the maneuvers performed off the mini trampoline by the Power Tumblers because the participants run 30 feet, spring off the mini trampoline, and go 8 to 10 feet in the air. The belt could not be recoiled quickly enough. Spotters are not effective for use with an adult-sized male. The only precautions that may be effective are to use mats and to teach the maneuvers slowly. Park stated that he warned all participants in the Power Tumblers program and the YWCA tumbling classes of the risks involved in the use of the mini trampoline. However, he did not specifically warn every individual that even if the maneuvers were done correctly, there was still a risk of serious injury.

The entire floor area around the trampoline was covered with two-inch floor mats. The eight-inch-thick crash mats were placed on top of the floor mats. The crash mats were up against the wall so they would not move. Matt had an intermediate skill level; he was qualified to do a front flip off the mini trampoline. However, he was not qualified to become a Power Tumbler. Park denied inviting Matt or Garrett to join the Power Tumblers or practice with them.

Park saw Matt and Garrett at the Power Tumblers' practice the evening of the accident; he did not object to their being there because they had already paid for the Mt. Zion tumbling class but could not at-

tend due to work obligations. It was within Park's discretion to allow them to participate in the Power Tumblers class. On the evening of the accident, each person in the class was to do only whatever maneuver off the mini trampoline he or she was capable of doing.

The YWCA sent out quarterly brochures to its members that included an advertisement of Park and his tumbling classes. Park identified payroll checks to him from the YWCA from August 1990 to January 14, 1993. He taught tumbling classes there. He considered himself an employee of the YWCA. The YWCA withheld taxes from his checks and he was covered under its insurance. He asked for, and received, permission to hold Power Tumblers practices at the YWCA. Park worked for the YWCA until May 1995. The YWCA did not pay him for the hour he coached the Power Tumblers.

At the beginning of the October 6, 1997, hearing on the motions for summary judgment, the trial court and counsel for all parties discussed what the court could consider in making its ruling. Counsel for the Park District stated the only issues on the summary judgment motions were whether a duty was owed and, if so, whether the Act provides immunity. The trial court heard arguments of counsel on the summary judgment motions. During the hearing, the trial court asked what evidence there was as to whom Park was working for at the time of Matt's injury. The court allowed a short recess so that counsel for all parties could review the discovery materials and when the hearing resumed, the issue of Park's alleged agency relationship with the YWCA was the focus of the remainder of the hearing. At the conclusion of the hearing, the trial court granted the motions as to all defendants. The trial court explained its reasoning as follows:

> "[THE COURT]: First of all, I am not granting the Summary Judgment on the basis of no duty. This was put on by a for-profit business. They've got a duty to supervise, duty to provide safe equipment. *** But, with regard to the Park District, [the] Court does find that they have absolute immunity under Section 2—201 for supervisory—I'm sorry—for the activities involving the exercise of discretion; they have absolute immunity under 3—108 for supervision situations. There's no evidence to raise a triable issue of fact as to whether or not Mr. Park is an employee of the Y.W.C.A. at the time of the injury.
>
> The evidence is clear, certain, and free from doubt, that at that time, he was not acting as an agent or employee of the Y; so, the Y has no vicarious liability in this case.
> ***
> *** [T]here's no triable issue of fact on the question of wanton and wilful conduct in this case, there's no evidence from which any reasonable trier of fact could find that there was wilful and wanton conduct on the part of Mr. Park."

## ANALYSIS

Plaintiffs first argue that the trial court erred in granting summary judgment to the Park District and Ken Park.

Are the Park District and Park Collaterally Estopped
From Raising an Immunity Defense Under the Act?
The material in this section is nonprecedential and not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

Did the Park District and Park Owe a Legal Duty To Warn of or
Protect Against Risks Associated With Use of a Mini Trampoline?
■ The Park District argues that the risk of falling from a height is open and obvious and that no duty was owed to Matt as a consequence. In support of its argument, it cites cases involving recreational activities or falls from playground equipment. For example, in *Alop v. Edgewood Valley Community Ass'n*, 154 Ill. App. 3d 482, 486-87, 507 N.E.2d 19, 22-23 (1987), a six-year-old child fell from a slide placed on asphalt. The child had used the same slide on one prior occasion and other slides on numerous occasions. It was held that the risk of falling off the slide onto the asphalt below was apparent and no duty was owed. In *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 458-59, 665 N.E.2d 826, 837 (1996), plaintiff, a 21-year-old man, was injured when he dove off a concrete seawall into Lake Michigan and struck his head on the sand bottom. Defendant had recently added sand in the vicinity of the wall. It was held that no duty to warn was created by this action where defendant could have reasonably expected plaintiff to appreciate the risks of diving.

The Park District has not cited any reported case dealing with use of a mini trampoline. Our own research has yielded one such case. In *Pell v. Victor J. Andrew High School*, 123 Ill. App. 3d 423, 462 N.E.2d 858 (1984), plaintiff, a high school student, was paralyzed as a result of an injury suffered while somersaulting on a mini trampoline during gym class. She sued the school district, high school, and manufacturer of the mini trampoline. The school district and the high school settled. The manufacturer appealed from a jury verdict in plaintiff's favor. One issue on appeal involved the adequacy of the manufacturer's warnings concerning use of the mini trampoline. Testimony at trial from two gymnastics coaches at the high school indicated they did not know that use of the mini trampoline involved any greater risk than other gymnastic equipment. The manufacturer's warnings did not specify a risk of spinal cord injury that could result in paralysis during somersaulting off the mini trampoline if performed without a spotter

or safety harness. In addition, the warnings were placed on the underside of the bed of the mini trampoline facing the floor. Warnings on the sides of the metal frame were covered by the frame pads and thus not visible. The appellate court held this evidence was sufficient for the jury to find that the warnings were inadequate. *Pell*, 123 Ill. App. 3d at 428-29, 462 N.E.2d at 863.

Although the *Pell* case involved a manufacturer's duty to warn, it does provide some insight into the special risks attendant to use of a mini trampoline, thus contradicting the Park District's open-and-obvious-danger argument. The risks associated with use of a mini trampoline cannot be logically compared to the risks of falling from a. height or activities such as diving. Use of a mini trampoline requires a certain level of skill not found in use of the recreational equipment involved in the cases cited by the Park District or in the diving cases. It is not an activity suited to every person. Further, the Power Tumblers is a Park District program that invites participation by highly skilled tumblers who perform for the public on behalf of the Park District. Thus, the Park District has assumed a greater responsibility here than did the defendants in the cases cited by the Park District.

Are the Park District and Park Absolutely Immune Under Section 3—108(a) of the Act From Liability For Alleged Improper or Inadequate Supervision?

Section 3—108(a) of the Act provides as follows: "Except as otherwise provided by this Act and subject to subdivision (b) neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3—108(a) (West 1992).

■ Plaintiffs rely on sections 3—106 and 3—109 of the Act, which they claim contain exceptions to the immunity granted by section 3—108(a) of the Act. Section 3—106 of the Act provides:

> "Neither a local public entity·nor a public employee is liable for an injury where the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes, including but not limited to parks, playgrounds, open areas, buildings or other enclosed recreational facilities, unless such local entity or public employee is guilty of willful and wanton conduct proximately causing such injury." 745 ILCS 10/3—106 (West 1992).

Section 3—109 of the Act provides in pertinent part:

> "(a) Neither a local public entity nor a public employee is liable to any person who participates in a hazardous recreational activity

\*\*\* for any damage or injury to property or persons arising out of that hazardous recreational activity.

(b) As used in this Section, 'hazardous recreational activity' means a recreational activity conducted on property of a local public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator.

'Hazardous recreational activity' also means:
        * * *

(3) \*\*\* trampolining \*\*\*.

(c) Notwithstanding the provisions of subsection (a), this Section does not limit liability which would otherwise exist for any of the following:
\*\*\*

(2) An act of willful and wanton conduct by a public entity or a public employee which is a proximate cause of the injury." 745 ILCS 10/3—109 (West 1992).

Section 3—106 of the Act, by its very terms, does not apply to limit the immunity granted by section 3—108. The latter section grants immunity for a failure to supervise an activity or use of public property, while section 3—106 of the Act concerns liability premised on the existence of a "condition" of public property. The allegations of plaintiffs' complaint at issue here are of failure to warn of the dangers of performing a front flip off of the mini trampoline and of failure to adequately supervise the activities of persons using the mini trampoline. No condition of the mini trampoline is involved in this case. The plain language of section 3—106 of the Act indicates that it applies only when the existence of a condition of the public property is involved. *McCuen v. Peoria Park District*, 245 Ill. App. 3d 694, 697, 615 N.E.2d 764, 767 (1993).

The same reasoning applies with respect to section 3—109(c)(1) of the Act, as there is no condition of the mini trampoline at issue here.

Plaintiffs argue that section 3—109(c)(2) of the Act is a limitation on the absolute immunity granted by section 3—108(a). Their argument is that use of a mini trampoline is a hazardous recreational activity and that wilful and wanton conduct is not immunized when it occurs in connection with such activities. They cite no case so holding. They argue that the plain language of section 3—109 compels this conclusion.

As stated, in this case, plaintiffs have alleged that the Park District failed to (a) provide a safety harness or belt, (b) warn of the dangers associated with using the mini trampoline and mats, (c) provide adequate spotters, (d) warn and instruct participants concerning the dangers associated with using a mini trampoline and mats and of the

known serious risk of severe spinal cord injury, (e) properly position the mats to prevent gaps, and (f) provide a safe coach. The gist of these allegations is that the Park District, through its employee, Park, failed to warn Matt of the dangers of spinal cord injury attendant to use of the mini trampoline and to adequately supervise activities performed on the mini trampoline given the dangers associated with its use. Thus, section 3—108(a) applies to immunize this conduct. Plaintiffs do not argue otherwise; they seek to avoid the immunity granted in that section by invoking section 3—109(c)(2) of the Act.

■ However, plaintiffs have misconstrued the import of section 3—109(c)(2) of the Act. That subsection does not itself create an exception to the absolute immunity granted by section 3—108(a) of the Act. It simply states that nothing in section 3—109(a) of the Act limits liability "which would otherwise exist" for an act of wilful and wanton conduct by a public entity or employee that is a proximate cause of injury. Thus, if section 3—108 of the Act does not itself contain an exception for wilful and wanton conduct in connection with supervisory activities, section 3—109(c)(2) of the Act does not apply to provide such an exception, simply because the activity involved may be a hazardous recreational activity. Section 3—108(a) of the Act contains no such exception; its plain language provides immunity for supervisory activities, regardless of whether the conduct is merely negligent or wilful and wanton. We note section 3—109(c)(2) of the Act also provides that nothing in that section creates a duty of care or basis of liability for personal injury or damage to personal property. We therefore reject plaintiffs' argument that section 3—109(c)(2) of the Act provides an exception to the absolute immunity granted by section 3—108(a) of the Act.

### Is Park Absolutely Immune Under Section 2—201 of the Act From Liability For His Exercise of Discretion?

■ Plaintiffs argue that Park's acts in supervising the activities on the mini trampoline were ministerial, rather than discretionary, and were thus not immunized under section 2—201 of the Act (745 ILCS 10/2—201 (West 1992)). That section provides as follows:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2—201 (West 1992).

Plaintiffs argue this section provides immunity only to public employees whose jobs require them to exercise discretion in the determi-

nation of policy. According to plaintiffs, since Park's actions involved neither the determination of policy nor the exercise of discretion, Park is not immune from liability for his actions.

However, this argument is incorrect. The supreme court has recently dealt with the issue of what policy decisions are covered under section 2—201 of the Act. In *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 692 N.E.2d 1177 (1998), plaintiff was involved in a fire drill planned and directed by the defendant city's fire department. The fire marshall directed plaintiff and others to stand near a door that had no windows. Plaintiff was injured when someone opened the door from the other side without warning and the door struck her. The trial court dismissed her claims against the city on the basis of immunity under the Act. The appellate court reversed this finding, holding that section 2—201 of the Act does not immunize the city because the fire marshall's actions, while discretionary, did not constitute a policy determination under the Act. On appeal to the supreme court, it was held that section 2—201 of the Act is concerned with both the type of position held by the employee and the type of action performed or omitted by the employee. Thus, actions immunized under section 2—201 must be both an exercise of discretion and a policy determination. The court noted it had previously held that policy decisions are those that require the governmental entity or employee to balance competing interests and make a judgment call as to what solution will best serve each of those interests. The complaint alleged that the fire marshall was responsible for planning and conducting fire drills. In planning the drills, the marshall was required to balance the competing interests of efficiency and safety. Thus, his acts were immunized under section 2—201 of the Act. *Harinek*, 181 Ill. 2d at 343, 692 N.E.2d at 1182.

■ Here, Park was responsible for coaching the Power Tumblers. In doing so, it was necessary for him to determine what maneuvers the Power Tumblers would perform, whether each participant was capable of performing those maneuvers, and what equipment and safety precautions were needed. He then had to balance those interests against the resources of the Park District and make a judgment as to how best to perform his coaching duties. This qualifies as the making of policy under the *Harinek* test.

Park's actions were also clearly discretionary acts for which immunity from liability is granted by section 2—201 of the Act.

"[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to

the official's discretion as to the propriety of the act." *Snyder v. Curran Township*, 167 Ill. 2d 466, 474, 657 N.E.2d 988, 993 (1995).

Plaintiffs have not identified in what manner Park's actions in coaching the Power Tumblers could be classified as ministerial. In fact, the parties disagree on what safety precautions were necessary or appropriate in using the mini trampoline. Plaintiffs allege that a safety harness or belt should have been used. Park testified in his deposition that such devices are not effective in preventing injuries such as Matt's. Plaintiffs allege that spotters should have been used. Park testified that spotters are not effective in preventing injury to an adult-sized person. Such decisions were clearly discretionary and were thus immunized under section 2—201 of the Act.

In light of our holdings that sections 3—108(a) and 2—201 of the Act provide Park and the Park District with absolute immunity for their discretionary and supervisory acts and omissions, we need not reach the question of whether the trial court erred in finding that the acts and omissions of Park and the Park District did not constitute wilful and wanton conduct as a matter of law. Thus, the trial court's order granting summary judgment to the Park District and Park must be affirmed.

### Did the YWCA Have a Duty To Warn or Protect Matt From Injury Associated With the Use of the Mini Trampoline?

The material in this section is nonprecedential and not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### Is the YWCA a Not-For-Profit Corporation Under Section 1—206 of the Act and, Thus, Immune From Liability For Negligence?

■ The YWCA argues that it is a local public entity as defined by the Act and is thus immune from liability for negligence. In addition to local governmental bodies, the term "local public entity" also includes "library systems and any intergovernmental agency or similar entity formed pursuant to the Constitution of the State of Illinois or the Intergovernmental Cooperation Act *as well as any not-for-profit corporation organized for the purpose of conducting public business.*" (Emphasis added.) 745 ILCS 10/1—206 (West 1992).

■ The YWCA is a not-for-profit corporation that receives some public funding. It points to the following factors in support of its argument that it is a public entity under the Act: (1) its mission, (2) it provides a variety of educational, artistic and physical fitness programs, and (3) it is open to all members of the community. The YWCA's mission is to create opportunities for women's growth, leadership, and power. The YWCA correctly notes that there are no reported cases explaining what is meant by the phrase "any not-for-profit

corporation organized for the purpose of conducting public business." It cites a federal district court case, *McQueen v. Shelby County*, 730 F. Supp. 1449 (C.D. Ill. 1990). There, plaintiff's decedent, an inmate at the county jail, was evaluated by defendants and determined not to be suicidal. He was returned to the general jail population, where he later committed suicide. Defendant filed a third-party complaint against Coles County Mental Health Center (Center). The Center filed a motion to dismiss the third-party complaint or for summary judgment, claiming immunity under the Act. The Center was a not-for-profit corporation, whose articles of incorporation provided that its purpose is to engage exclusively in scientific, literary, and educational activities leading to the promotion and conservation of the mental health of the people of Coles County. The Center claimed it was a local public entity under the Act. The district court agreed and entered summary judgment in favor of the Center. The court noted that the Center received 90% of its funding from public sources. It refused to interpret the statute to impose a requirement that a public entity must possess the attributes of a "body politic," such as the power to tax. *McQueen*, 730 F. Supp. at 1454.

Regardless of its mission statement or its sources of funding, the YWCA is a membership organization. It exists for the benefit of its members, not for the benefit of the public at large. Thus, in this respect, the YWCA differs from the Center in *McQueen*. We decline to find that a membership organization such as the YWCA is a public entity entitled to the immunities and defenses of the Act.

### Did the Trial Court Err in *Sua Sponte* Raising the Issue of an Alleged Agency Relationship Between the YWCA and Park?

Plaintiffs argue that the issue of whether there was an agency relationship between the YWCA and Park was not properly a part of the hearing on the motions for summary judgment. They point out that the issue was not raised in any of the motions and they insist that its resolution was not necessary to a decision on the motions.

■ The YWCA's motions for summary judgment alleged only that (1) it had no duty to warn Matt of an open and obvious danger and (2) it is a local public entity under the Act and is thus immune from liability for negligence. In its ruling, the trial court found that there was a duty owed to Matt and that the YWCA was not entitled to immunity under the Act. These findings should have resulted in a denial of the YWCA's motion, but the trial court, having raised the issue of agency on its own, ruled that there was no agency and granted the YWCA's motion. Plaintiffs had no notice that this issue would be raised. The short break given counsel by the trial court during the

motion hearing to review discovery materials on the issue was no substitute for proper notice and an opportunity to prepare for argument. Accordingly, we must reverse the trial court's order granting summary judgment to the YWCA. In doing so, we express no opinion as to the merits of the allegations of agency in plaintiffs' complaint.

## CONCLUSION

For the reasons stated, the trial court's order granting summary judgment to the Park District and Park is affirmed. Its order granting summary judgment to the YWCA is reversed and the cause remanded for further proceedings.

Affirmed in part and reversed in part; cause remanded.

GREEN and STEIGMANN, JJ., concur.