2023 IL App (1st) 211448

SECOND DIVISION
August 29, 2023

No. 1-21-1448

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| NICOLE THOMPSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 17 L 3490 |
| | ) | |
| JOSEPH LaSPISA, D.D.S, | ) | Honorable |
| | ) | Bridget Mitchell, |
| Defendant-Appellee. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, Nicole Thompson, appeals the entry of summary judgment in favor of defendant, Dr. Joseph LaSpisa, on her medical negligence claim. The circuit court entered summary judgment on the sole basis that Thompson failed to present expert testimony on the element of proximate cause. We disagree that Thompson's claims are subject to a *per se* bar simply because she lacked expert testimony on proximate cause. We hold, instead, that some of her claimed damages require expert testimony to establish a proximate causal link and some do not. We thus affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                    BACKGROUND

¶ 3     In spring 2015, Thompson's usual dentist referred her to Dr. LaSpisa, an oral surgeon. After an initial consultation, a procedure was scheduled for April 9 to extract several of her teeth.

On that day, Dr. LaSpisa informed Thompson of the risks, including infection, and extracted the teeth. (There is no claim that Dr. LaSpisa failed to obtain informed consent or that he negligently performed the procedure.) After the extractions, Dr. LaSpisa provided Thompson with the standard prescription for antibiotics, pain medication, and an oral rinse. Because the procedure ended in the evening, Thompson was not able to get the prescriptions filled that night.

¶ 4     When Thompson awoke the next morning, April 10, she was experiencing significant pain and swelling in her face. These symptoms only intensified throughout the day. Concerned, at about 4:30 p.m., she called 34th Street Dental—the office where Dr. LaSpisa performed the extractions. Thompson spoke with Marcela Corona, the office manager. According to Thompson, she relayed a few symptoms: pain, swelling, bruising, and difficulty breathing. Ms. Corona testified that she did not recall hearing that last complaint, which would have prompted her to immediately direct Thompson to the hospital. And Corona's handwritten notes memorializing this conversation in detail make no mention of breathing difficulties.

¶ 5      In an affidavit dated March 14, 2020, Corona testified that, after speaking with Thompson on April 10, 2015, Corona "called Dr. LaSpisa a[t] his Elmhurst office on that day to tell him of Nicole Thompson's phone call" and "relayed the same information that is in my note" quoted above. At her deposition on June 23, 2020, Corona clarified that it would have been her custom and practice to have contacted Dr. LaSpisa, but she did not specifically recall, five years later, whether she talked to him on that day. Dr. LaSpisa testified that he and Ms. Corona did not speak that day; he was unaware of Thompson's complaints.

¶ 6     Throughout the night of April 10, Thompson's condition worsened. By Saturday morning, April 11, the pain was intolerable. At about 8:30 a.m., she called 34th Street Dental and left a distressed voicemail. Since she could not contact anyone, she decided to head to the

emergency room (ER). She arrived at the ER at a little after 9 a.m., was viewed only by a nurse who thought she might have an abscess, and was discharged without treatment.

¶ 7    Thompson felt she still needed help and decided to go to her normal dentist. At about 1:30 p.m. that day, she was examined by Dr. Cheethirala. Dr. Cheethirala quickly recognized that Thompson needed treatment for a likely post-operative infection. He told her to immediately head to the hospital because he believed she needed IV antibiotics. In addition, Dr. Cheethirala faxed a handwritten note with his findings to Advocate Sherman Hospital (Sherman).

¶ 8    Thompson arrived at Sherman's ER around 2 p.m. She was diagnosed with facial cellulitis and hospitalized for IV antibiotic treatment. Thompson said that, once she arrived at the hospital and was given pain medication, the pain started to go down. In her words, "[a]fter only a few hours on the IV[,], I start[ed] to feel improvement. The pain was still bad, but improving. The swelling had already started to go down a bit. Improvement continued steadily while I was on the IV." After five days of treatment and observation, she was discharged.

¶ 9    In April 2017, Thompson filed suit against Dr. LaSpisa and 34th Street Dental, claiming negligence and medical battery. 34th Street Dental eventually settled and is no longer a party to the case. What ultimately survived was a claim of negligence against Dr. LaSpisa. In essence, Thompson claimed that Dr. LaSpisa was negligent in "fail[ing] to respond to Plaintiff's calls and provide follow up care" and "[n]egligently abandon[ing] the health and wellbeing of his patient."

¶ 10    Dr. LaSpisa moved for summary judgment, arguing that Thompson could not establish that he "refused" to treat her, nor could she meet the element of proximate cause. On the issue of proximate cause, Dr. LaSpisa raised one and only one argument—that even had plaintiff been able to reach him on April 10, 2015, he would have given her the same advice that Corona gave

her. Thus, Thompson could not establish that any negligence Dr. LaSpisa committed could be the proximate cause of any damages suffered.

¶ 11    After briefing and an oral argument (of which we lack a transcript), the circuit court entered summary judgment in favor of Dr. LaSpisa. In its written order, the circuit court relied on a ground not raised in Dr. LaSpisa's papers but apparently raised for the first time at oral argument by Dr. LaSpisa. The court ruled that plaintiff could not establish proximate cause because plaintiff did not have expert testimony on that element, and "a party cannot maintain a medical negligence action without expert testimony on proximate cause." The circuit court quoted *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006), for the proposition that "[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty." As plaintiff did not retain an expert on proximate causation, her claim failed as a matter of law. Thompson timely appealed.

¶ 12                              ANALYSIS

¶ 13    Several questions are raised before us, procedural and substantive. On matters of procedure, Thompson says that she was treated unfairly because the court based its entry of summary judgment on an issue not raised by LaSpisa in his motion, as LaSpisa ambushed Thompson at the oral argument with a new argument that ultimately carried the day with the trial court. (She has another claim that the circuit court improperly shifted the burden of proof, which will be unnecessary for us to reach and is meritless in any event.)

¶ 14    On the substance, we must consider whether the argument raised by LaSpisa in his motion for summary judgment is meritorious; whether the same is true of the new argument raised by LaSpisa at the oral argument on which the trial court based its ruling; and whether an

additional argument raised by LaSpisa below, on which the trial court did not rule, would be an alternative basis for us to affirm summary judgment.

¶ 15    We review the court's entry of summary judgment *de novo*. *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 24. Summary judgment is appropriate if there are no contested issues of material fact, and the movant is entitled to judgment as a matter of law. *Id.*

¶ 16                                                    I

¶ 17    We start with the basis for the court's decision below that Thompson's medical negligence claim fails because she did not present expert testimony on the question of proximate cause. Plaintiff's complaints on this issue are both procedural and substantive.

¶ 18                                                    A

¶ 19    The procedural complaint, again, is that LaSpisa never claimed in his motion for summary judgment that Thompson's claims were barred due to lack of expert testimony on the element of proximate cause. Rather, the issue was sprung on Thompson at oral argument.

¶ 20    We can verify from the record that Dr. LaSpisa never raised this argument in his summary judgment pleadings. He argued a lack of proximate cause but on a very different ground than the absence of expert testimony. And though we lack a transcript of the oral argument, it seems clear that it was LaSpisa, not the court, who first raised the argument at the hearing. The trial court indicated in its written order that LaSpisa raised this argument, and LaSpisa acknowledges on appeal that he did so.

¶ 21    We understand that issues will sometimes arise in the moment, raised by one of the parties or by the court *sua sponte*. There is nothing inherently wrong with that, especially when experienced and able judges, like the one here, flag an issue not raised by the parties.

¶ 22 But regardless of whether the issue is raised spontaneously by the court or a party, best practices and procedural fairness dictate that, before that issue is resolved, all parties have a meaningful opportunity to weigh in. In a situation like this one, where a new argument in support of summary judgment is raised at oral argument after the briefing is completed, the opposing party should be given an opportunity to respond. A lawyer who shows up for an oral argument prepared to argue "Issue A" might be unable to effectively address "Issue B" on the spot. And everything we have just said is all the more critical if "Issue B" is one that, if accepted by the trial court, results in the termination of the party's case, as here.

¶ 23 Indeed, on several occasions, this court has overturned grants of summary judgment when an issue raised for the first time post-briefing became the basis for summary judgment. See *Miwel, Inc. v. Kanzler*, 2019 IL App (2d) 180931, ¶¶ 11-12 (trial court erred in granting defendant summary judgment based on invalid assignment, when defendant sought summary judgment on various other grounds; "plaintiff was not given sufficient notice and opportunity to argue that its assignment did not run afoul of the UCC"); *Tyler Enterprises of Elwood, Inc. v. Skiver*, 260 Ill. App. 3d 742, 753 (1994) (trial court improperly entered summary judgment based on proximate cause, though defendant only sought summary judgment as to validity of exculpatory clause and claims of willful and wanton misconduct); *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798, 811-12 (1998) (grant of summary judgment improper, as trial court *sua sponte* raised issue of vicarious liability, when defendant sought summary judgment only on issues of duty and statutory immunity; "[p]laintiffs had no notice that this issue would be raised," and "[t]he short break given counsel *** during the motion hearing to review discovery materials on the issue was no substitute for proper notice and an opportunity to prepare for

argument"), *abrogated on other grounds by Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 232 (2007).

¶ 24    True, in each of those cases, the trial court raised the issue *sua sponte*, unlike here, but the point remains the same—the trial court ruled dispositively against the plaintiff, Thompson, on an issue that had not been briefed and which Thompson could not possibly have expected would be a topic of debate at the oral argument. We join those other decisions in expressing our concern that a party was blindsided by an argument that she had no meaningful opportunity to address and that resulted in the termination of her lawsuit.

¶ 25    But we depart with those decisions in terms of the appropriate disposition on appeal. We do not think the proper course here is to vacate and remand for a new hearing, for three reasons.

¶ 26    First, we do not know what happened at the oral argument, as we lack a transcript. We do not know, for example, whether the court gave Thompson an opportunity to brief the new issue and she declined—resulting in forfeiture (if not waiver) of her procedural objection on appeal. We have our doubts that this is what happened; Dr. LaSpisa does not so claim; and the written judgment order gave no hint of any such thing, or even that this argument was raised for the first time at oral argument; but we cannot truly know. And it is Thompson's burden as the appellant to provide us this information. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 27    Far more important are two other interrelated reasons. The first is that, as noted, our review is *de novo*, meaning we sit in exactly the same position as the trial judge, without any deference to the trial court's judgment. *Beauchamp v. Dart*, 2022 IL App (1st) 210091, ¶ 8. For all practical purposes, the parties are litigating the summary judgment motion anew before three judges of the appellate court. And this time, Thompson faces no ambush; she can and did argue the substance of the ruling on its merits.

¶ 28 The other is that we may affirm summary judgment on any basis in the record, even if it was not the basis on which the trial court ruled, and even if we disagree with the trial court's reasons. *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 50. We are concerned with the court's judgment, not its reasoning. *Id.* So we could consider this issue, anyway, and would be particularly inclined to do so given that the parties have fully briefed it.

¶ 29 It thus makes little sense to remand the case for a new hearing on the summary judgment motion—one which we quite possibly will find ourselves reviewing *de novo* at some point in the future, anyway. That is especially true were we to affirm the grant of summary judgment—why not say so now, as opposed to making the parties spend additional time, resources, and money on the case? The question is before us now, and the parties have fully briefed it. Judicial economy dictates that we decide this question now.

¶ 30                                    B

¶ 31 To the merits. It is undisputed that, while Thompson has presented expert testimony on the standard of care for oral surgeons like Dr. LaSpisa, she presented no expert testimony that the delay in her treatment proximately caused her damages. The circuit court found this absence fatal, writing that "a party cannot maintain a medical negligence action without expert testimony on proximate cause." The circuit court noted Dr. LaSpisa's citations to two cases, *Snelson v. Kamm*, 204 Ill. 2d 1 (2003), and *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289 (2008), for that proposition. And the court quoted one of its own, *Ayala*, 367 Ill. App. 3d at 601 ("[p]roximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty."). Before this court, Dr. LaSpisa cites those cases and adds another, *Ruffin v. Boler*, 384 Ill. App. 3d 7, 20 (2008) ("the plaintiff's burden as to proximate cause must be established by medical expert testimony").

¶ 32 To set this straight: It is incorrect to state, full stop, that expert testimony is necessary to prove the elements of a medical negligence action. It is certainly true that *usually*, expert testimony will be necessary to prove the elements of standard of care (duty) and proximate cause—but to state it as a universal rule is incorrect. Expert testimony is *usually* required in a medical negligence action because in the typical case, the proof consists of specialized medical knowledge beyond the ken of the ordinary juror, thus requiring testimony from an expert in the field. As our supreme court recently put it:

> "*Generally speaking*, expert testimony is required to establish what an ordinarily careful professional would do in a given situation 'because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician.' [Citation.] However, where defendant's conduct is so grossly negligent or the treatment so common that *a layman could readily appraise it, no expert testimony is necessary*." (Emphases added.) *Johnson v. Armstrong*, 2022 IL 127942, ¶ 52.

¶ 33 Indeed, one of the cases cited by Dr. LaSpisa, on which the circuit court relied, said much the same thing. In *Snelson*, 204 Ill. 2d at 43-44, our supreme court referred to the "general rule" that, "except in very simple cases, expert testimony is necessary in professional negligence cases to establish the standard of care and that its breach was the proximate cause of the plaintiff's injury." Note the qualifier—"except in very simple cases." *Id.* at 43. The court there was saying in shorthand precisely what we are saying: if the proof regarding standard of care or proximate cause is "very simple"—that is, if specialized knowledge is *not* required—then expert testimony is not needed. If specialized knowledge is necessary, so is expert testimony.

¶ 34    That is really nothing more than a restatement of the rules of evidence regarding expert testimony in any case in Illinois. See Ill. R. Evid. 701 (eff. Jan. 1, 2011) (lay witness may not testify to opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."); Ill. R. Evid. 702 (eff. Jan. 1, 2011) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). It merely plays a more outsized role in cases of medical negligence because "laypersons normally are not qualified to evaluate professional medical conduct." *Addison v. Whittenberg*, 124 Ill. 2d 287, 297 (1988).

¶ 35    But sometimes "the common knowledge of laymen is sufficient." *Walski v. Tiesenga*, 72 Ill. 2d 249, 257 (1978). For example, we would not need an expert in the field to tell us that a surgeon should not leave sponges or medical instruments inside a patient's body before stitching them up. See *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 865-66 (2008); *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 296 (2000) (citing *Walski*, 72 Ill. 2d at 257). And "common sense dictates" that, before restraining a patient who is a danger to himself and others, medical personnel should search the individual for weapons or dangerous implements; no expert testimony is necessary because "[o]ne need not be a doctor, a nurse, or any other kind of health provider to appreciate these risks." *Heastie v. Roberts*, 226 Ill. 2d 515, 554-55 (2007).

¶ 36    As for the element of proximate cause, there may be situations where it is obvious to the lay juror that a certain condition would result from a breach of the standard of care. That seems especially true when it comes to pain and suffering, a fairly common element of damages in a negligence case. If an oral surgeon negligently removes a tooth, it might require an expert to explain that the resulting infection could spread to internal organs or the brain, but would an

expert be needed to explain to the jury that a mouth infection causes pain? If a plaintiff's arm is severed in a construction accident, we might need an expert to explain how that injury led to a secondary stroke or kidney infection, but would we need an expert to explain that it hurt a lot? One would think lay testimony on the pain's severity and duration would suffice.

¶ 37    To be fair to the circuit court, some of the cases on which it relied did contain language stating, as a hard-and-fast rule, that expert testimony is required—without qualification—to prove proximate cause in medical negligence cases. See *Ruffin*, 384 Ill. App. 3d at 20; *Ayala*, 367 Ill. App. 3d at 601; *Wiedenbeck*, 385 Ill. App. 3d at 293 ("Proximate cause must be established by expert testimony to a reasonable degree of medical certainty.").

¶ 38    They are not the only decisions to so state; they are too numerous to list here. Our research suggests that dozens, if not over a hundred, decisions have misstated the rule. See, *e.g.*, *Walton v. Dirkes*, 388 Ill. App. 3d 58, 60 (2009) ("Proximate cause must be established by expert testimony to a reasonable degree of medical certainty."); *Krivanec v. Abramowitz*, 366 Ill. App. 3d 350, 356-57 (2006) ("The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty."); *Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27 (2000) ("Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty."). Those decisions overstate the rule on the requirement of expert testimony and should not be followed for that proposition.

¶ 39    We acknowledge, as well, that the supreme court stated the rule this way on one occasion. See *Simmons v. Garces*, 198 Ill. 2d 541, 556 (2002) ("In a medical malpractice case, proximate cause must be established by expert testimony to a reasonable degree of medical certainty."). But while our appellate courts have since quoted *Simmons* for this proposition, our

supreme court has not. And that statement in *Simmons* is at odds with other supreme court precedent pre- and postdating *Simmons*, including most notably *Snelson*, 204 Ill. 2d at 43-44, decided the year after *Simmons*, which stated the principle as a "general rule" applicable "except in very simple cases."

¶ 40    The weight of supreme court authority to the contrary convinces us that the formulation of this rule in *Simmons* is an outlier and not the law of Illinois. Expert testimony is not *automatically* required to prove the elements of a medical negligence action but, rather, is required when the proof requires specialized knowledge beyond the ken of the average lay juror, as it usually will. See, *e.g.*, *Johnson*, 2022 IL 127942, ¶ 52; *Heastie*, 226 Ill. 2d at 554-55; *Jones*, 191 Ill. 2d at 296; *Addison*, 124 Ill. 2d at 297; *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986); *Walski*, 72 Ill. 2d at 257.

¶ 41    It is well and good for reviewing courts to state the "general rule" regarding expert testimony in medical negligence cases. But circuit judges, considering individual cases with their own unique facts, should not simply default to general rules. They would be better served not to start with a thumb down on one side of the scale but rather to simply ask this question: does the proof that the plaintiff is offering on standard of care or proximate cause require scientific, technical, or other specialized knowledge beyond the ken of the ordinary layperson? If the answer is yes, as it usually will be, then lay testimony will not suffice, and expert testimony is required. See Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 42    Sympathetic as we are with the trial court, which was following binding appellate case law, we must disagree with its conclusion that summary judgment was proper here for no other reason than Thompson's failure to offer expert testimony on the question of proximate cause.

The question is not subject to a bright-line rule but requires an evaluation of the circumstances of the individual case to determine whether expert testimony is necessary.

¶ 43    Indeed, the reason we have elaborated on this discussion at length is not only to clarify the law but because the facts of this case present a fine illustration of this dichotomy at work. In our view, some of the damages claimed here did, indeed, require expert testimony to show a causal link with the (alleged) deviation from the standard of care, while some did not.

¶ 44    Recall that Thompson claims (among other things) that, by his failure to make himself available, Dr. LaSpisa failed to give her the correct advice—to go to the hospital, the ER, immediately—when he should have, and the delay in her doing so for some 18 hours led to two distinct injuries. The first injury is that her condition worsened to an extent that it would not have, had she gone to the hospital immediately. That led, in turn, to a longer hospital stay than would have been necessary had she immediately gone to the hospital.

¶ 45    In our view, expert testimony would be necessary to establish a proximate causal relationship for this injury. The difference between how much Thompson's facial cellulitis would have progressed had she immediately received emergent hospital care, versus how much it *did* progress with those additional 18 hours lacking such care, requires knowledge beyond the ken of the layperson. We know there was a delay in her treatment, and we know from her testimony, the medical records, and the grisly photos that her condition worsened over those 18 hours. We also know that her swelling improved quite soon after she was hospitalized.

¶ 46    We do not know, however, whether earlier treatment would have prevented that additional swelling or whether this particular infection would have reached its full potential, anyway, even if immediately treated. We do not know whether or to what extent her hospital stay would have been shortened, either. To answer these questions would require a firm knowledge of

the finer points of facial cellulitis. The average person knows nothing of that affliction, its treatment, and its course of progression; expert testimony was necessary to explain it.

¶ 47    Thompson's other claim of damages, however, is the pain and suffering she endured during those 18 hours. We know from her testimony and the record that she suffered pain throughout these 18 hours; that it persisted and even worsened during that time; and that, once she was hospitalized and given stronger medication, the pain began (and continued) to subside.

¶ 48    The layperson may not know about the minutiae of facial cellulitis, but everyone understands the basics of pain relief. The stronger hospital medication relieved Thompson's pain once she took it; had she started taking it 18 hours earlier, her pain would have begun to subside 18 hours sooner. Specialized knowledge is not required for a juror to make that connection.

¶ 49    That is not to say that Dr. LaSpisa could not challenge this notion; our only point is that expert testimony is not required. So it was error to enter summary judgment in Dr. LaSpisa's favor on the issue of proximate cause insofar (and only insofar) as it concerns Thompson's claim of pain and suffering. She has established a colorable causal connection between the alleged deviation from the standard of care and her pain and suffering. In all other respects, the grant of summary judgment, based on the lack of expert testimony to prove proximate cause, was proper.

¶ 50                                        II

¶ 51    We now turn to the actual basis for summary judgment that Dr. LaSpisa asserted below, though the circuit court did not reach it. Though we have already upheld much of the circuit court's ruling, if Dr. LaSpisa is correct on his original argument, he will prevail as to the claims of pain and suffering that have thus far survived our analysis, as well.

¶ 52    Dr. LaSpisa's argument is straightforward: Though Thompson may have been unable to contact him, the advice she received from Ms. Corona was exactly the same advice he would have given her had they connected by phone—and thus she cannot show proximate cause.

¶ 53    Whatever else may be said about this argument, the most glaring problem is that Thompson swears that she told the person who answered her call, Ms. Corona, that in addition to pain and swelling, she was having trouble breathing. And every doctor in this case—the experts and even Dr. LaSpisa himself—states categorically that, if a patient says she is having trouble breathing, she should be told to go straight to a hospital's ER.

¶ 54    Dr. LaSpisa goes to great lengths to downplay that (contested) fact. He is correct that Ms. Corona did not document breathing difficulty as a complaint from Thompson, does not remember Thompson mentioning it, and typically would tell a patient with difficulty breathing to go to the ER immediately. At trial, Thompson will have her work cut out for her. But we are at summary judgment, where we take the evidence in the light most favorable to the non-movant, Thompson. See *Jones*, 191 Ill. 2d at 291.

¶ 55    So for our purposes, we must assume that Thompson told Ms. Corona that she was having trouble breathing. And that takes the legs out from under this argument. If, as we assume, Thompson told Corona that she was having breathing problems, and Ms. Corona did not tell her to go straight to the ER, then by his own sworn testimony, Dr. LaSpisa would *not* have given Thompson the same advice that Corona gave her. Or conversely, had he given her that same advice, by his own testimony, that advice would have been faulty. Either way, his argument fails.

¶ 56                                        III

¶ 57    We finally consider the alternative argument below, on which we could affirm summary judgment if we found it meritorious. We do not.

¶ 58    Dr. LaSpisa's final argument goes like this: this case is one of "patient abandonment;" the definition of patient abandonment under Illinois law is when a doctor "refuses" to care for the patient, and because Dr. LaSpisa did not even know Thompson was trying to reach him, he could not have "refused" to treat her. But every prong of this "gotcha" syllogism has its problems.

¶ 59    Dr. LaSpisa treats the phrase "patient abandonment" as if it is a cause of action of its own, complete with its own elements—one of which includes the doctor "refusing" to care for his or her patient. Thus, if there is no evidence of "refusal," there is no claim. But "patient abandonment" is just shorthand, a description of one way a medical professional could be liable for negligence. Whatever theory one might pursue, the cause of action is negligence, requiring the plaintiff to prove duty (standard of care), breach of duty (deviation from standard), and damages proximately caused by the breach. *Johnson*, 2022 IL 127942, ¶ 51.

¶ 60    To be sure, one duty a physician owes is to use reasonable care in continuing treatment for follow-up complications, or at least provide the patient a reasonable time to find substitute care. See *Mayer v. Baisier*, 147 Ill. App. 3d 150, 160 (1986); *Magana v. Elie*, 108 Ill. App. 3d 1028, 1034 (1982). But before we cram all of Thompson's claims into one box of "patient abandonment," the least we can do is review what duty or duties—what standards of care—Thompson claims that Dr. LaSpisa owed.

¶ 61    Thompson's expert opined that (1) an oral surgeon must provide his patient a means to reach him post-surgery if complications arise; (2) the person who answers the patient's call, if not the surgeon, must be able to get in touch with the surgeon; (3) at a bare minimum, the person to whom this responsibility is delegated must be qualified to confer with patients—"it should never be delegated to a receptionist or any other layperson;" (4) if a patient complains that her medication is not working, the surgeon should meet with the patient; and finally, (5) if the patient

complains of difficulty breathing, that patient should be directed immediately to the ER. We would note that Dr. LaSpisa does not dispute—at least here, on summary judgment—that those standards of care are valid and accurate. So we accept them as valid, viewing the evidence in the light most favorable to Thompson.

¶ 62    Thompson claims that these duties were breached in that Dr. LaSpisa did *not* provide a means for direct contact, did *not* provide for the person receiving Thompson's call to make contact with him, and did *not* delegate responsibilities for patient conversations to someone qualified to dispense advice. She further claims that the person who took her call that day, Ms. Corona, did not send her directly to the ER, even though she complained of difficulty breathing (a fact, again, that we must accept at this stage).

¶ 63    If a jury were to accept that these standards of care are as Thompson's expert claims, then it would be ironic, to say the least, if Dr. LaSpisa could brush all this away by simply claiming that he never knew Thompson was trying to reach him. That is Thompson's very point—he was supposed to put in a place a system so he *would* know of her call—or at least, if he could not be reached, someone qualified to respond to her concerns would give her the appropriate advice. Dr. LaSpisa's obliviousness to her call, in other words, is one of the breaches of the standard of care she is alleging. It would stand the law on its head to allow a doctor to escape liability at summary judgment for breach of duty via an argument that is premised on the fact that he breached that very duty. At the summary judge, accepting Thompson's position as to the standard of care and accepting that Dr. LaSpisa breached it, Dr. LaSpisa's argument is untenable.

¶ 64    Even if we indulged Dr. LaSpisa's insistence on framing this case strictly as "patient abandonment," we still would not see things as he does. True, the case law has referred to a doctor's "refusal" to treat the patient when discussing the theory of "patient abandonment." See

No. 1-21-1448

*Mayer*, 147 Ill. App. 3d at 160; *Magana*, 108 Ill. App. 3d at 1034. But the theory of "patient abandonment" comes in many flavors, depending on the facts of the case. It could consist of a doctor failing to promptly act on a possible problem and delegating the matter to another doctor who likewise fails to promptly act. See *Karsten v. McCray*, 157 Ill. App. 3d 1, 11 (1987) (discussing *Casey v. Penn*, 45 Ill. App. 3d 573, 581 (1977)).

¶ 65    Another example, hitting much closer to home, is *Longman v. Jasiek*, 91 Ill. App. 3d 83, 84-85 (1980), where the plaintiff repeatedly contacted her oral surgeon regarding post-surgery complications, and the surgeon's staff repeatedly directed the plaintiff to her family doctor, even though the family doctor himself told the plaintiff to return to the oral surgeon. We upheld the jury's verdict "that the defendant's conduct in abandoning and refusing to treat the plaintiff during postoperative complications was wrongful." *Id.* at 88. What the oral surgeon's staff did in *Longman* is not materially different than what the person answering Thompson's call, Ms. Corona, did. If the oral surgeon there was liable, then it is hard to imagine how, at the summary judgment stage, Dr. LaSpisa can avoid liability.

¶ 66    In any event, we do not feel compelled to shoehorn Thompson's negligence claim into one solely of "patient abandonment," impose a requirement that Dr. LaSpisa must have *knowingly* refused to treat her, and thus affirm judgment in his favor, rewarding him for the very breach of duty that, at the summary judgment stage, we must assume he breached.

¶ 67                                CONCLUSION

¶ 68    The judgment of the circuit court is affirmed in part and reversed in part. Plaintiff's negligence action survives summary judgment only to the extent that she seeks damages of pain and suffering as indicated in this opinion. We affirm summary judgment in all other respects and remand this cause for further proceedings.

- 18 -

¶ 69    Affirmed in part and reversed in part; cause remanded.

## *Thompson v. LaSpisa*, 2023 IL App (1st) 211448

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-3490; the Hon. Bridget Mitchell, Judge, presiding. |
| **Attorneys for Appellant:** | Gregory X. Gorman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jeremiah P. Connolly, Jeffrey J. Escher, and Brett S. Shimanovsky, of Connolly Krause LLC, of Chicago, for appellee. |